# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00037-CV

**Texas Board of Chiropractic Examiners; Patricia Gilberts, in her Official Capacity as the Board's Executive Director; and Texas Chiropractic Association, Appellants**

**v.**

**Texas Medical Association, Appellee**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. D-1-GN-11-000326, HONORABLE RHONDA HURLEY, JUDGE PRESIDING

## O P I N I O N

Appellants the Board of Chiropractic Examiners ("the Board"); Patricia Gilberts, in her Official Capacity as the Board's Executive Director; and the Texas Chiropractic Association ("the Association") complain of the trial court's judgment declaring void certain portions of the Board's rule that defines the chiropractic "scope of practice." *See* 22 Tex. Admin. Code § 78.13 (2018) (Tex. Bd. of Chiropractic Exam'rs, Scope of Practice). As explained below, we affirm the trial court's judgment in part and reverse it in part.

## Background

Texas law places regulation of the practice of medicine in the hands of the Texas Medical Board. *See* Tex. Occ. Code §§ 151.001-.056 (Medical Practice Act). The practice of medicine is defined as "the diagnosis, treatment, or offer to treat a mental or physical disease or

disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions" by someone who claims to be a doctor or who charges money or other compensation for such services. *Id*. § 151.002(a)(13). The Legislature has exempted certain professions from the Medical Practice Act and has enacted other boards and statutory schemes to govern those professions. Licensed chiropractors who "engage[] strictly in the practice of chiropractic as defined by law" are among those specifically exempted, *id*. § 151.052(a)(3), and their practice is governed by the Board under the Chiropractic Act, chapter 201 of the occupations code, *see id.* §§ 201.001-.606.[1] As relevant to this case, the practice of chiropractic is defined as the use of "objective or subjective means to diagnose, analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body"; or the performance of "nonsurgical, nonincisive procedures, including adjustment and manipulation, to improve the subluxation complex or the biomechanics of the musculoskeletal system."[2] *Id*. § 201.002(b).

Following a directive by the Legislature, *see id.* §§ 201.1525, .1526, the Board adopted its "Scope of Practice" rule ("the Rule"), which defines certain terms and identifies procedures that fall within the scope of chiropractic practice. *See* 22 Tex. Admin. Code § 78.13 (recodified in 2015, formerly 22 Tex. Admin. Code § 75.17). Among other things, the Rule provides that a licensed chiropractor may provide "an analysis, diagnosis, or other opinion regarding the

---

[1] For a lengthy discussion of the history of chiropractic care, *see Texas Board of Chiropractic Examiners v. Texas Medical Association*, 375 S.W.3d 464, 466-73 (Tex. App.—Austin 2012, pet. denied).

[2] A person also practices chiropractic if she represents to the public that she is a chiropractor or uses the terms "chiropractor," "chiropractic," "doctor of chiropractic," "D.C.," or any derivative thereof in connection with her name. Tex. Occ. Code § 201.002(b)(3), (4).

findings of examinations and evaluations," including an "analysis, diagnosis or other opinion regarding the biomechanical condition of the spine or musculoskeletal system" or an "analysis, diagnosis or other opinion regarding a subluxation complex of the spine or musculoskeletal system." *Id.* § 78.13(d)(1) (formerly section 75.17(d)(1)).[3]

In a prior lawsuit brought in 2006, appellee the Texas Medical Association ("TMA") sued, complaining that certain aspects of the Rule, including its use of the word "diagnosis" in a provision stating that a chiropractor may "render an analysis, diagnosis, or other opinion regarding the findings of" examinations or evaluations conducted by the chiropractor, exceeded the statutory scope of chiropractic practice. *See Texas Bd. of Chiropractic Exam'rs v. Texas Med. Ass'n*, 375 S.W.3d 464, 472-73 (Tex. App.—Austin 2012, pet. denied) ("*Chiropractic Examiners I*"). The trial court agreed, and the Association appealed,[4] complaining among other issues that the trial court had erred in determining that the Rule exceeded chiropractic's statutory scope of practice in its use of the word "diagnosis" in former section 75.17(d)(1)(A), now section 78.13(d)(1), which allowed a chiropractor to "render an analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations." *Id*. at 491. Having reviewed the Rule and relevant portions of the occupations code, as well as the ordinary meaning of the words used in the statutes and rules, we concluded at that time that:

---

[3] Exactly the same language that was used in former section 75.17(d)(1) is now found in the Rule's current version, section 78.13(d)(1).

[4] Appellants both filed notices of appeal, but only the Association raised issues related to the use of the word "diagnosis." *See Texas Bd. of Chiropractic Exam'rs*, 375 S.W.3d at 488.

> [R]egardless of whether diagnosis, pathology, or etiology invoke concepts of disease as the Physician Parties suggest, the bottom line is that paragraph (d)(1)(A) limits chiropractors to diagnoses regarding "the biomechanical condition of the spine and musculoskeletal system" as required by the statutory scope of chiropractic. . . . [T]he plain language of section 75.17(d)(1) provides that chiropractors may render diagnoses regarding findings and examinations within the statutory scope of chiropractic, and offers a non-exclusive list of examples of such opinions. It does not, by its plain language, allow them to render diagnoses that do not involve the statutory scope of chiropractic. As such, it does not exceed the statutory scope of chiropractic. Accordingly, the provision does not exceed the statutory scope of chiropractic.

*Id.* at 495.[5]

In October 2010, while *Chiropractic Examiners I* was pending, the Board amended the Rule, and TMA filed the underlying suit in 2011, complaining about the new provision that would allow chiropractors who undergo additional training to perform Technological Instrumented Vestibular-Ocular-Nystagmus Testing ("VONT"). 22 Tex. Admin. Code § 78.13(c)(3)(B). After the trial court granted summary judgment in favor of TMA, the Board appealed. *See Texas Bd. of Chiropractor Exam'rs v. Texas Med. Ass'n*, No. 03-12-00151-CV, 2012 WL 5974063, at *2 (Tex.

---

[5] We similarly disagreed with TMA's argument that the use of the word "diagnosis" in former section 75.17(d)(1)(B), now section 78.13(d)(1)(B), violated the statutory scope of chiropractic and allowed chiropractors to diagnose "neurological conditions, pathological and neuro-physiological consequences that effect the spine and musculoskeletal system, and 'other body systems' that are affected by subluxation," stating:

> We disagree that this provision sweeps so broadly. Although the definition of "subluxation complex" indicates that its existence may have functional or pathological consequences or that it may affect essentially every part of the body, the rule itself only allows chiropractors to render an analysis, diagnosis, or other opinion regarding a subluxation complex of the spine or musculoskeletal system. Accordingly, it does not exceed the statutory scope of chiropractic.

*Id*. at 496.

App.—Austin Nov. 21, 2012, no pet.) (mem. op.) ("*Chiropractic Examiners II*"). We reversed the trial court's granting of summary judgment, holding that neither side had established its right to judgment on the issues related to VONT as a matter of law. *Id*. at \*5-8.

On remand, TMA amended its petition to also challenge the provisions of the Rule that (1) define the musculoskeletal system as the "system of muscles and tendons and ligaments and bones and joints and associated tissues *and nerves* that move the body and maintain its form"; (2) define subluxation complex as a "*neuro*musculoskeletal condition that involves an aberrant relationship between two adjacent articular structures that may have functional or pathological sequelae, causing an alteration in the biomechanical and/or *neuro*-physiological reflections of these articular structures, their proximal structures, and/or other body systems that may be directly or indirectly affected by them"; and (3) provide that chiropractors may "render an analysis, *diagnosis*, or other opinion regarding the findings of examinations and evaluations," including a *diagnosis* "regarding the biomechanical condition of the spine or musculoskeletal system" or "regarding a subluxation complex of the spine or musculoskeletal system." 22 Tex. Admin. Code § 78.13(a)(5), (9), (d) (emphases added).

The Board filed a plea to the jurisdiction, arguing that the trial court lacked subject matter jurisdiction over the issues related to whether chiropractors may make "diagnoses" because those issues had been litigated already. The trial court denied the plea, and the Board appealed. *See Texas Bd. of Chiropractic Exam'rs v. Texas Med. Ass'n*, No. 03-14-00396-CV, 2014 WL 7014530, at \*2 (Tex. App.—Austin Dec. 8, 2014, pet. denied) (mem. op.) ("*Chiropractic Examiners III*"). We affirmed the trial court's denial of the plea, explaining that "[t]he most that might be said is that the

5

TMA could be barred by collateral estoppel from contending that the use of the word 'diagnosis' in the rule provisions challenged in this case renders them invalid. Collateral estoppel, however, is an affirmative defense that does not implicate the trial court's jurisdiction." *Id*. at *3.

The cause returned to the trial court, which eventually signed a final judgment declaring void the following portions of the Rule defining the chiropractic "scope of practice": (1) the portion allowing certain chiropractors to perform VONT; (2) the definition of "musculoskeletal system" as including nerves; (3) the definition of "subluxation complex" as a "*neuro*musculoskeletal condition"; and (4) the use of the term "diagnosis." Appellants argue that nerves are associated with subluxation complexes and are an integral part of chiropractic treatment and that correction of biomechanical problems affects nerves, which means that the Rule's references to "nerves" or "neuro" are consistent with the statutory scope of chiropractic. They also argue that TMA did not prove that the VONT provision is invalid because TMA did not prove that VONT was intended to be used exclusively to diagnose diseases of the brain, ear, or eye, whereas appellees did offer uncontradicted evidence that VONT is useful in chiropractic practice. Finally, they argue both that the Rule's use of "diagnosis" was within the statutory scope of chiropractic practice and that the issue has already been decided and may not be relitigated.

**Standard of Review**

In recently considering a similar challenge to an agency's rule, the supreme court reiterated that a state administrative agency only has powers expressly conferred by the Legislature or implied because they are reasonably necessary to carry out the agency's statutory duties. *Texas State Bd. of Exam'rs of Marriage & Family Therapists v. Texas Med. Ass'n*, 511 S.W.3d 28, 33

6

(Tex. 2017). Thus, an agency can adopt only rules that are authorized by and consistent with its statutory authority. *Id*. We generally presume that an agency's rules are valid, and a party challenging a rule bears the burden of proving its invalidity by showing that "the rule's provisions are not in harmony with the general objectives of the act involved." *Id*. (cleaned up). Courts discern those objectives from "the plain text of the statutes that grant or limit the agency's authority," and the challenging party must show that the rule contravenes specific statutory language, runs afoul of the statute's general objectives, or imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions. *Id.* If a statute or rule does not define a term, we apply the term's common, ordinary meaning unless a contrary meaning is apparent from the context in which the term is used. *Id.* at 34.

We review a court's conclusions of law de novo, including questions of statutory construction. *All Am. Life Ins. Co. v. Rylander*, 73 S.W.3d 299, 301 (Tex. App.—Austin 2001, pet. denied); *see Valdez v. Hollenbeck*, 465 S.W.3d 217, 227 (Tex. 2015). We review a trial court's findings of fact for legal and factual sufficiency under the same standards we apply when reviewing a jury's findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *State v. Crawford*, 262 S.W.3d 532, 544 (Tex. App.—Austin 2008, no pet.). In considering a legal sufficiency challenge, we view the evidence in the light favorable to the finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *Crawford*, 262 S.W.3d at 544; *see City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In considering factual sufficiency, we consider and weigh all the evidence, both supporting and against the finding, and will set aside a finding only if it is so against the great weight and

7

preponderance of the evidence as to be clearly wrong and unjust. *Crawford*, 262 S.W.3d at 544; *see*

*Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996).

## Discussion

We first consider appellants' arguments related to the Rule's references to nerves.

Under the Chiropractic Act, a person practices chiropractic if she "uses objective or subjective means

to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal

system of the human body" or "performs nonsurgical, nonincisive procedures, including adjustment

and manipulation, to improve the subluxation complex or the biomechanics of the musculoskeletal

system."[6] Tex. Occ. Code § 201.002(b). The Rule defines "musculoskeletal system" as the "system

of muscles and tendons and ligaments and bones and joints and associated tissues and nerves that

move the body and maintain its form" and "subluxation complex" as a "neuromusculoskeletal

condition that involves an aberrant relationship between two adjacent articular structures that may

have functional or pathological sequelae, causing an alteration in the biomechanical and/or

neuro-physiological reflections of these articular structures, their proximal structures, and/or

other body systems that may be directly or indirectly affected by them." 22 Tex. Admin.

Code § 78.13(b)(1). It is the Rule's references to "nerves," "neuromusculoskeletal," and

"neuro-physiological" that were declared by the trial court to exceed the scope of chiropractic.

---

[6] As the Board's attorney explained at trial, the occupations code basically "divides the practice of chiropractic into two parts." He further asserted that "the first part should be interpreted broadly to allow chiropractors great latitude in determining, first, whether a patient is appropriate for chiropractic treatment," whereas treatment is narrower and is limited to "adjustments, manipulations, or other techniques to improve the subluxation complex or biomechanics."

Appellants argue that the practice of chiropractic has always involved nerves because chiropractic treats subluxations, which are dysfunctions in the joints, usually the spine, that "cause nerve interference." A chiropractor looks to all of a patient's symptoms, including pain—a signal carried by the nervous system—to determine whether the patient has a subluxation. And, in treating the subluxation, the nervous system is necessarily involved, both during treatment and in the "benefits of treatment," when pain is reduced or eliminated. Appellants further note that because nerves are involved in the body's subconscious ability to locate and orient itself, a subluxation that distorts a patient's equilibrium signals can be treated through chiropractic, and thus chiropractic treatment seeks to influence "neurophysiological function." Because nerves are associated with subluxation complexes and are an integral part of chiropractic treatment, appellants argue, it is proper for the Rule's definition of "subluxation complex" to include a "nerve component" and for the definition of "musculoskeletal system" to include nerves.

TMA, on the other hand, notes that the Legislature specified that chiropractors may analyze and treat "the biomechanical condition of the spine and musculoskeletal system," which it argues impliedly excludes the nervous system. *See Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 493 n.7 (Tex. 1993) ("Th[e] doctrine [of *expressio unis est exclusio alterius*] provides that the inclusion of a specific limitation excludes all others. . . . Thus, by expressly stating under what circumstances a governmental entity may regulate the location of an alcohol related business, it follows that there are no other instances when a governmental entity may regulate the location of an alcohol related business."); *see also Continental Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 401-02 (Tex. 2000) (conclusion that Legislature

9

did not intend right to review under specific section of labor code was supported by express inclusion of right to review in other statutes and exclusion in statute in question; "The Legislature's express inclusion of a right to judicial review in these other sections suggests that the language conferring a right to an APA hearing was either insufficient or not intended to grant a right to judicial review."). TMA asserts that there is no "commonly accepted definition of musculoskeletal system that includes nerves" and that the Board's inclusion of "nerves" or "neuromusculoskeletal system" in the Rule exceeds the proper scope of chiropractic.

The trial court made the following findings of fact relevant to this issue:

- In health care, "neurology" is the scientific study of the nervous system and the diseases that affect it.

- Biomechanics means the study of mechanical laws and their application to living organisms, especially the human body and its locomotor system.

- In the application and interpretation of the Scope of Practice rule, [the Board] intends for the term "diagnosis" to mean more than the analysis, examination and evaluation of the biomechanical condition of the spine or musculoskeletal system. [The Board] intends the term to mean and include the diagnosis of neurological diseases and disorders, among others.

- The human body is composed of a number of "systems," including the skeletal system, muscular system, nervous system, cardiovascular, digestive, reproductive, urinary, endocrine, and integumentary system (the skin). Most of these systems have been recognized as such since the late 1600s.

- The muscular system is the collection of organs that are called muscles and that are attached to bones. The skeletal system is the bones. For convenience, the two systems generally are described together as the "musculoskeletal system."

- The nervous system is the collection of organs that sense or perceive the outside world, process that information and deliver the appropriate signals to the muscular system for action. There is no commonly accepted definition of musculoskeletal system that includes nerves.

10

- Nerves are not part of the muscle system and they are not part of the skeletal system, including the spine.

- The use of the term "neuro" in the definitions of musculoskeletal system and subluxation complex is intended to authorize licensed chiropractors to diagnose neurological diseases and disorders.

- Licensed chiropractors who do not have a certification of a "diplomate" in chiropractic neurology diagnose nervous system diseases and disorders in their patients.

Before making those findings, the trial court heard testimony, both live and via deposition, from two medical doctors, six doctors of chiropractic, a physical therapist specializing in dizziness and balance disorders, and a professor in the Department of Neurobiology and Anatomy at the University of Texas Medical School at Houston. The experts agreed that nerves are *associated with* the musculoskeletal system, causing the musculoskeletal system to move and transmitting pain signals when the system is damaged or a subluxation is present. As explained by several witnesses, the various systems of the body work together and impact each other. All of the experts agreed that the human body is made of integrated systems, which interact with and have effects on each other. The experts agreed that nerves "innervate" muscles and that pain signals sent through the nervous system indicate issues in other systems. The Board's witnesses emphasized a "functional" view of the body's systems, as opposed to the more formal "anatomical standpoint" that TMA's witnesses seemed to take.

Professor Leonard Cleary explained in his deposition testimony, presented as an exhibit, that "biomechanics" are the "intrinsic principles of the structures of the human body that relate to mechanical forces, so that would include intrinsic properties like stiffness or elasticity and the forces that are generated by those structures." In his opinion, the "only way the nervous system

11

affects the biomechanics is by signaling muscles to contract and thereby creating a force in those muscles." He also explained that various organs of the body can be "associated" with more than one system, using as an example a bone, which has components of both the skeletal system (the hard, mineral portion) and the system that generates blood cells (the bone marrow). Dr. Cleary testified that similarly, there are nerves in muscles, tendons, ligaments, and spinal discs and, thus, that on some level, certain nerve tissues are considered a "part" of tendons, ligaments, and muscles. However, he drew a distinction between a nerve being a *part* of a muscle and considering such nerves to be part of the muscular or musculoskeletal *system*. He said, "I've never heard people talk about the nervous system as being part of the musculoskeletal system in any context until this case."

Dr. Cleary said the conventional view of the skeletal system was "the vertebra, the spine, and the bones that are connected to that, directly or indirectly" (the bones in the ear, called ossicles, and the hyoid bone, located in the neck between the jaw and the larynx, are not part of the conventional view of the skeletal system). Dr. Cleary believes that "'musculoskeletal' is a combination term—that is there is a skeletal system (comprised of bones) and a muscular system (comprised of skeletal i.e., striated muscle)." He further testified that there are both "functional" and "anatomical" systems, depending on how the systems are being discussed or viewed, and said that the Board was taking the anatomical term "musculoskeletal" system and "put[ting] it into a functional context," giving a new and "idiosyncratic" meaning to a long-standing term. He explained that the conventional view of "musculoskeletal" is the anatomical view used for hundreds of years, but that the Board's "functional" use might lead to confusion because only a specific group would perceive the term in the way the Board was using it. Asked whether several textbooks'

12

references to nerves in their discussions of the muscular system amounted to their including nerves "as part of the muscle system," Dr. Cleary said, "I would disagree with you on that point. It includes [nerves] as an element of the muscle, . . . but it does not expand that to say that nerves are part of the muscular system."

Dr. Jim Kemper, an ear, nose and throat specialist, said he understood the term "neuromusculoskeletal" to mean "pertaining to or affecting the nervous muscular and skeletal systems." He testified that in healthcare professions, the human body is divided into systems. He had never used the term "neuromusculoskeletal" and testified that "[t]he way most people refer to it is musculoskeletal or nervous." He further testified that the nervous system is not part of the muscular system, although "it has to be there for it, just like the cardiovascular system has to be there for it, just like the lymphoid system has to be there for it, but it's not a part of it." Nor, Dr. Kemper stated, was the nervous system part of the musculoskeletal system. Another witness testified similarly that the term "neuromusculoskeletal" is not a medical term of art, despite its being found in a common medical dictionary, explaining, "It's defined, it's just not something that we use commonly. We have the musculoskeletal system, the neurologic system." He agreed that nerves are affected by chiropractic care in that the treatment may give the patient some pain relief, but insisted that chiropractic treatment does not "treat" nerves. The physical therapist testified that she had seen the term "neuromusculoskeletal" used in chiropractic terminology but said that she did not "see neuromuscular as much as I see musculoskeletal."

Dr. Kenneth Thomas testified that chiropractors need to understand the nervous system in order to treat back pain and that treatment of a subluxation and surrounding tissues also

13

involves the nerves in the area. He said, "[T]here's no way for me to deliver an adjustment, let's say, to a joint for the biomechanical problem without affecting the nerve." He testified that modern definitions of subluxation generally refer to "associated nerves." He also read aloud the World Health Organization's definition of "subluxation complex" as the "[t]heoretical model and description of the motion segment dysfunction which incorporates the interaction of pathological changes in nerve, muscle, ligamentous, vascular and connective tissue."

The evidence is clear that in treating a subluxation causing pain, the chiropractor seeks to relieve pain, which necessarily has an effect on the nervous system. However, the fact that nerves are affected by disorders in or treatment of the musculoskeletal system does mean that the nervous system or the nerves themselves fall within the scope of chiropractic. In other words, a chiropractor's consideration of pain signals in evaluation or treatment does not mean that the chiropractor is examining or treating nerves or the nervous system. Indeed, the experts agreed that the consideration of signals sent through the nervous system has always been a part of chiropractic practice. Further, this Court already noted in *Chiropractic Examiners II* that the Legislature did not intend to restrict chiropractic examinations solely to the musculoskeletal system and spine, explaining that a chiropractor may examine other parts or systems of the body if such examination "will assist in analyzing or evaluating the biomechanical condition of the spine or musculoskeletal system." 2012 WL 5974063, at *5. Thus, the Rule as written before the addition of "nerves" and "neuro" comprehended and allowed for consideration of and affect on nerves, and we disagree with appellants' contention that elimination of those phrases will "jeopardize[] patient care."

14

Just as the evidence shows that "musculoskeletal system" is an informal combination of two more-precisely understood anatomical terms "muscular system" and "skeletal system," the term "neuromusculoskeletal system" is a combination of the nervous system, the muscular system, and the skeletal system. Chiropractic, however, is statutorily limited to evaluation of the "biomechanical condition of the spine and musculoskeletal system" and to nonsurgical procedures "to improve the subluxation complex or the biomechanics of the musculoskeletal system." Tex. Occ. Code § 201.002(b). Although consideration of other bodily systems may be necessary to evaluate the biomechanical condition of the spine and the musculoskeletal system, *see Chiropractic Examiners II*, 2012 WL 5974063, at *5, that does not mean that the definition of "musculoskeletal system" should be expanded to include associated nerves or that "subluxation complex" should be defined as a condition extending beyond the musculoskeletal system. Based on our review of the evidence put forth before the trial court, we hold that sufficient evidence supports the court's findings related to the Rule's reference to nerves and the "neuromusculoskeletal system" in its definition of "musculoskeletal system" or "subluxation complex." We overrule appellants' issues related to the Rule's definitions.

We next turn to whether the trial court properly struck as invalid the Rule's provisions related to VONT. The provision in question states:

> Technological Instrumented Vestibular-Ocular-Nystagmus Testing may be performed by a licensee with a diplomate in chiropractic neurology and that has successfully completed 150 hours of clinical and didactic training in the technical and professional components of the procedures as part of coursework in vestibular rehabilitation including the successful completion of a written and performance examination for vestibular specialty or certification. The professional component of these procedures

15

may not be delegated to a technician and must be directly performed by a qualified licensee.

22 Tex. Admin. Code § 78.13(c)(3)(B).

The trial court determined that the Rule's VONT provision "exceeds the scope of chiropractic as defined in Tex. Occ. Code § 201.002(b) and is therefore void." In making that determination, the trial court found:

- VONT is a purely diagnostic neurological test intended to diagnose a problem of the brain, inner ears or eyes. It includes tests of vestibular function which are designed to evaluate the inner ear (vestibular apparatus) and the neural connections between the inner ear and the parts of the brain that control eye movement.

- VONT includes both Electronystagmography (ENG) and Videostagmography (VNG) which are eye movement tests that look for signs of vestibular dysfunction or neurological problems by measuring "nystagmus" which is a type of involuntary side-to-side eye movement.

- VONT also can include "hi-thermal caloric testing" in which cold and warm water is introduced into each ear and the nystagmus is measured to evaluate the relative vestibular weakness of each ear.

- The eyes, ears and brain are not part of the spine or musculoskeletal system. No disorder of the biomechanical condition of the spine or the musculoskeletal system causes any vestibular system pathology.

Appellants assert that there are legitimate chiropractic uses for VONT, that it can be used to evaluate the spine and musculoskeletal system, and therefore, that it is proper for the Rule to allow chiropractors to perform VONT. Appellants assert that TMA did not provide evidence that VONT was intended solely to diagnose diseases of the brain, ears, or eyes while they offered "uncontradicted evidence" that VONT is useful to chiropractors in the proper scope of their practice.

TMA provided as evidence comments to the 2010 Rule revisions. *See* 35 Tex. Reg. 9508, 9508-10 (2010) (Tex. Bd. of Chiropractor Exam'rs, Rules of Practice). In the comments,

16

the Board acknowledged that "disorders affecting the biomechanical condition of the spine and musculoskeletal system do not cause vestibular system pathology" but stated that such pathologies "can affect the role or the musculoskeletal system in providing the body with balance and form."

Dr. Kemper testified that dizziness, balance problems, and vertigo rank "third behind headaches and low back pain for primary care doctors. . . . It's very common." He said such issues can be the result of a wide range of causes, including "cardiovascular problems, low blood pressure, arrhythmias, and other things like that"; "labyrinthitis, an infection of the inner ear"; Meniere's disease; tumors; cysts; multiple sclerosis; or certain other diseases. Dr. Kemper testified that if a patient presents with complaints about dizziness, he will perform a full physical examination and often VONT, which he described as "a test where we're using eye movements and responses to the from [sic] the extra-ocular muscles to determine how the brain is interpreting head movement and other things." He explained that VONT is a "starting point" or "an adjunct [or] helper in diagnosing the patient's problems" and that it is "[v]ery seldom" the only test that is performed to find a definitive diagnosis of the patient's problems. He agreed that "vestibular system pathologies can affect" the body's balance and form and, thus, the role of the musculoskeletal system but disagreed that VONT can "reveal anything about the biomechanical condition of the spine or musculoskeletal system." He further testified that he was not aware of any "disorders of the biomechanical condition of the spine or musculoskeletal system" that "cause any vestibular system pathology." Finally, when asked whether chiropractic manipulation was a "recognized treatment for any vestibular disorder," Dr. Kemper responded that manipulation or adjustment "is not a recognized treatment within the medical field."

17

Although appellants produced evidence indicating that VONT may be a useful tool to chiropractors, the evidence establishes that VONT helps in the diagnosis of vestibular issues. The evidence further establishes that, although vestibular diseases might have an impact on the musculoskeletal system, disorders falling within the ambit of chiropractic do not cause vestibular pathologies. Simply because the test might under some circumstances be useful does not require that chiropractors be able to perform the test—the fact remains that the scope of chiropractic practice is limited under Texas law. On this record, we cannot conclude that the trial court erred in its findings of fact or in concluding that the Rule's provision related to VONT exceeded the scope of chiropractic. We overrule appellants' issues related to VONT.

Finally, we consider appellants' issues related to the Rule's use of the word "diagnosis" in its provision that licensed chiropractors may make "an analysis, diagnosis, or other opinion." *See* 22 Tex. Admin. Code § 78.13(d).

Although the parties disagree on whether this Court has already decided the issue against TMA, we need not reach that question. First, we note that effective September 1, 2017, section 201.002 of the occupations code was amended to provide that a person practices chiropractic if she, among other things, "uses objective or subjective means to *diagnose*, analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body." Tex. Occ. Code § 201.002(b)(1) (emphasis added); *see* Act of May 22, 2017, 85th Leg., R.S ch. 294, §§ 1, 24, 2017 Tex. Gen. Laws 545, 545, 551. Thus, as TMA acknowledges, the word "diagnose" is expressly included in the occupations code itself, limited to the biomechanical condition of the spine and musculoskeletal system. *See Chiropractic Examiners I*, 375 S.W.3d at 493 ("[T]he bottom

line is that paragraph (d)(1)(A) limits chiropractors to diagnoses regarding 'the biomechanical condition of the spine and musculoskeletal system' as required by the statutory scope of chiropractic. Accordingly, the provision does not exceed the statutory scope of chiropractic.").

Further, the supreme court recently addressed a similar issue when it considered an agency rule that allowed marriage and family therapists to provide "diagnostic assessments" relying on knowledge of the Diagnostic and Statistical Manual of Mental Disorders. *Texas State Bd. of Exam'rs of Marriage & Family Therapists*, 511 S.W.3d at 30-32. In that case, TMA challenged the agency's rule, arguing that the Therapists Act expressly allowed marriage and family therapists to "evaluate—but not diagnose—conditions" and that the Act's language by implication "excludes diagnosing from the practice of marriage and family therapy. *Id.* at 36. The court looked to the plain meaning of "evaluate" and "diagnose" and concluded:

> Considering the common, ordinary meanings of the terms within their statutory context, we conclude that by authorizing [marriage and family therapists] to "evaluate and remediate" their clients' dysfunctions, the Therapists Act authorizes [marriage and family therapists] to provide a "diagnostic assessment" as the Therapists Board's rule uses that phrase.

*Id.* at 38. In reaching its conclusion, the court specifically referred to the Chiropractic Act, saying:

> Other [Occupations] Code provisions, however, refer to the terms in a manner that demonstrates that an evaluation necessarily includes a diagnosis or identification of the thing being evaluated. For example, the Code provides that chiropractic practice includes the use of "objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body," without using the term diagnosis. [Tex. Occ. Code] § 201.002(b)(1). But it then provides that a chiropractic patient's records include records "of the identity, diagnosis, evaluation, or treatment of a patient by a chiropractor." *Id.* § 201.402(b) (emphasis added); *see also id.* § 201.405(a) (providing that "chiropractic records"

19

means "any record relating to the history, diagnosis, treatment, or prognosis of a patient"). These provisions indicate that the chiropractor's authority to "analyze, examine, or evaluate" the patient includes the authority to diagnose the patient, such that the patient's records include records of the "diagnosis . . . of a patient by a chiropractor."

*Id.* at 37.

Considering the supreme court's analysis discussed above and in light of the Legislature's specifically adding "diagnosis" to the occupations code, we hold that the trial court erred in determining that the Rule's use of the word "diagnosis" is improper. We sustain appellants' issues related to the court's declaration that the use of "diagnosis" in section 78.13(d) was void because it exceeds the scope of chiropractic.

## Conclusion

We have overruled appellants' issues related to the Rule's references to nerves and its provision related to VONT. We have sustained their issues related to the Rule's use of the word "diagnosis." We therefore reverse the trial court's judgment as far as it declares that the use of "diagnosis" in section 78.13(d) exceeds the scope of chiropractic practice and is void. We affirm the remaining portions of the court's judgment.

_____
Cindy Olson Bourland, Justice

Before Justices Puryear, Pemberton, and Bourland
  Justice Pemberton not participating

Affirmed in Part; Reversed and Rendered in Part

Filed: November 21, 2018