# IN THE SUPREME COURT OF TEXAS

═══════════════
No. 18-1223
═══════════════

TEXAS BOARD OF CHIROPRACTIC EXAMINERS;
PATRICK FORTNER, IN HIS OFFICIAL CAPACITY AS THE BOARD'S EXECUTIVE DIRECTOR;
AND TEXAS CHIROPRACTIC ASSOCIATION, PETITIONERS,

v.

TEXAS MEDICAL ASSOCIATION, RESPONDENT

═══════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════

**Argued September 16, 2020**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE DEVINE, JUSTICE BLACKLOCK, and JUSTICE BUSBY joined in full, and in which JUSTICE BOYD and JUSTICE BLAND joined except with respect to Part III(D).

JUSTICE BLAND delivered an opinion dissenting in part, in which JUSTICE BOYD joined.

JUSTICE HUDDLE did not participate in the Court's decision.

This ten-year-old case is part of "a long history of professional, scientific, or economic antagonism between chiropractors and the medical community, and resultant disputes, spanning all three branches of government, regarding where any legal line between chiropractic and the

practice of medicine is or should be."[1] The Texas Chiropractic Act (the Act)[2] draws that line by defining the practice of chiropractic to include evaluating the *musculoskeletal system* and improving the *subluxation complex*.[3] The Texas Board of Chiropractic Examiners (the Board) has issued rules defining both terms as involving nerves in addition to muscles and bones.[4] Another Board rule authorizes chiropractors to perform an eye-movement test for neurological problems that is known by the acronym VONT.[5] The Texas Medical Association (TMA) asserts that only physicians may perform VONT. But as we recently stated, "every act that a physician may do is not automatically the unlawful practice of medicine when done by a non-physician, and terminology in one field may overlap with that of another."[6] We conclude that the challenged rules, read in context, do not exceed the statutory scope of chiropractic practice. We reverse that part of the court of appeals' judgment declaring the rules invalid[7] and render judgment that they are valid.

---

[1] *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 375 S.W.3d 464, 467 (Tex. App.—Austin 2012, pet. denied). That case was a precursor to this one. The parties have appealed the underlying case three times to the court of appeals and twice to this Court. Each appeal to the court of appeals is styled *Texas Board of Chiropractic Examiners v. Texas Medical Board*. In order they are No. 03-12-00151-CV, 2012 WL 5974063 (Tex. App.—Austin Nov. 21, 2012, no pet.) (mem. op.); No. 03-14-00396-CV, 2014 WL 7014530 (Tex. App.—Austin Dec. 8, 2014, pet. denied) (mem. op.); and 566 S.W.3d 776 (Tex. App.—Austin 2018) (the decision below).

[2] TEX. OCC. CODE §§ 201.001–201.606.

[3] *Id.* § 201.002(b)(1)–(2).

[4] *See* 22 TEX. ADMIN. CODE § 78.1(a)(5), (9).

[5] *See id.* § 78.1(c)(3)(B) (providing that certain chiropractors may perform "Technological Instrumented Vestibular-Ocular-Nystagmus Testing" on patients).

[6] *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 41 (Tex. 2017).

[7] 566 S.W.3d 776 (Tex. App.—Austin 2018).

## I

## A

Chiropractic traces its roots to an encounter in the late 1800s between an alternative-medicine practitioner, D.D. Palmer, and his hearing-impaired office janitor. The details of the encounter have been disputed, but Palmer later claimed that he performed a manual manipulation of the janitor's spine, after which his hearing rapidly improved.[8] What is not in dispute is that Palmer came to theorize that disease and ill health are caused by vertebral misalignment, a condition he called *subluxation*.[9]

Like medical practice, chiropractic practice has evolved over the last century, though spinal alignment remains at its core. Today chiropractors are portal-of-entry healthcare providers in all 50 states, meaning that a referral is not required to visit one. Medicare and Medicaid cover chiropractic services. Texas' workers' compensation regulations authorize the more than 6,000 chiropractors in this state to treat injured workers.[10]

## B

Article XVI, Section 31 of the Texas Constitution authorizes the Legislature to "pass laws prescribing the qualifications of practitioners of medicine in this State, and to punish persons for mal-practice". Exercising that authority, the Legislature has passed the Medical Practice Act (the

---

[8] A brief summary of the history of chiropractic may be found on the American Chiropractic Association's website. *Origins and History of Chiropractic Care*, AM. CHIROPRACTIC ASS'N, https://www.acatoday.org/About/History-of-Chiropractic (last visited Jan. 24, 2021).

[9] The word *subluxation*, built on the Latin *luxatio*, dislocation, means a partial dislocation. *Subluxation*, WEBSTER'S THIRD NEW INT'L DICTIONARY (1969).

[10] 28 TEX. ADMIN. CODE § 42.20(a).

MPA).[11] *Practicing medicine* is broadly defined as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method".[12] The MPA empowers the Texas Medical Board "to regulate the practice of medicine" in Texas[13] and provides that "[a] person may not practice medicine in this state unless the person holds a license issued" by the Board.[14] The MPA carves out certain nonphysician healthcare providers whose practices would otherwise fall within the definition of practicing medicine, including dentists, optometrists, nurses, podiatrists, psychologists, physical therapists,[15] and "licensed chiropractor[s] engaged strictly in the practice of chiropractic as defined by law".[16]

The Act defines chiropractic practice. As passed in 1949, the Act provided that a chiropractic practitioner is one "who shall employ objective or subjective means . . . for the purpose of ascertaining the alignment of the vertebrae of the human spine[] and . . . adjusting the vertebrae to correct any subluxation or misalignment thereof."[17] Forty years later, the Legislature amended this provision to define a chiropractic practitioner as one who "(1) uses objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body [or] (2) uses adjustment, manipulation, or other procedures in order to

---

[11] TEX OCC. CODE §§ 151.001–170.003.

[12] *Id.* § 151.002(13).

[13] *Id.* § 152.001(a).

[14] *Id.* § 155.001.

[15] *Id.* § 151.052(1)–(2), (4)–(7).

[16] *Id.* § 151.052(3).

[17] Act of Apr. 21, 1949, 51st Leg., R.S., ch. 94, § 1, 1949 Tex. Gen. Laws 160, 160–161 (current version at TEX. OCC. CODE §§ 201.001–201.606). The Court of Criminal Appeals had invalidated prior legislation regulating chiropractic practice. *See Ex parte Halsted*, 182 S.W.2d 479, 488 (Tex. Crim. App. 1944).

4

improve subluxation or the biomechanics of the musculoskeletal system".[18] We refer to these two provisions as *evaluation* and *treatment,* respectively. In 1995, the Legislature further clarified the evaluation provision.[19] Today, following further amendments, the scope of chiropractic practice, now codified in § 201.002(b) of the Act, is as follows:

> (b)    A person practices chiropractic . . . if the person:
>
> (1)    uses objective or subjective means to diagnose, analyze, examine, or evaluate the biomechanical condition of the spine and musculo-skeletal system of the human body; [or]
>
> (2)    performs nonsurgical, nonincisive procedures, including adjustment and manipulation, to improve the subluxation complex or the bio-mechanics of the musculoskeletal system[.][20]

The Act does not define the terms in these provisions. It excludes "incisive or surgical procedures" from the practice,[21] but that exclusion does not apply to "the use of a needle for the purpose of drawing blood for diagnostic testing."[22] The Act also excludes from chiropractic practice prescribing drugs and using x-rays or other therapies that expose the body to radiation.[23] But the Act otherwise leaves to the Board the adoption of "rules clarifying what activities are included within the scope of the practice of chiropractic and what activities are outside of that scope."[24]

---

[18] Act of May 12, 1989, 71st Leg., R.S., ch. 227, § 1, 1989 Tex. Gen. Laws 1005, 1005 (current version at TEX. OCC. CODE §§ 201.002(b)(1)–(2)).

[19] *See* Act of May 29, 1995, 74th Leg., R.S., ch. 965, § 13, 1995 Tex. Gen. Laws 4789, 4802 (current version at TEX. OCC. CODE §§ 201.002(b)(1)–(2)).

[20] TEX. OCC. CODE § 201.002(b)(1)–(2).

[21] *Id.* § 201.002(c)(1).

[22] *Id.* § 201.002(a)(3).

[23] *Id.* § 201.002(c)(2)–(3).

[24] *Id.* § 201.1525.

The Board had no such rulemaking authority under the 1949 Act; its function was to license and train chiropractors.[25] In 1981, the Legislature directed the Board to "adopt guidelines for . . . acceptable practices for all aspects of the practice of chiropractic."[26] But the Legislature drew back in 1993, forbidding the Board from

> adopt[ing] a rule relating to the meaning of the practice of chiropractic under this Act except for:
>
> (1)    a rule relating to an adjustment, manipulation, or other procedure directly related to improving the subluxation of the spine or of the musculoskeletal system as it directly relates to improving the subluxation of the spine; or
>
> (2)    a rule that defines an unacceptable practice of chiropractic and provides for a penalty or sanction under this Act.[27]

In the very next session, the Legislature about-faced, replacing this very restrictive provision with a 12-word carte blanche: "The Board shall adopt rules for regulation and enforcement of this Act."[28] Finally, in 2005 the Legislature amended the Act to clarify that "[t]he board may adopt rules . . . necessary to . . . regulate the practice of chiropractic" and "shall adopt rules for the enforcement" of the Act.[29] More specifically, the Act states:

---

[25] *See* Act of Apr. 21, 1949, 51st Leg., R.S., ch. 94, § 4, 1949 Tex. Gen. Laws 160, 161–162 ("The Board may prescribe rules, regulations and bylaws in harmony with the provisions of this Act for its own proceedings and government for the examination of applicants for license to practice chiropractic.") (current version at TEX. OCC. CODE § 201.1525).

[26] Act of May 26, 1981, 67th Leg., R.S., ch. 781, § 4(d), 1981 Tex. Gen. Laws 2955, 2957 (current version at TEX. OCC. CODE § 201.1525).

[27] Act of May 30, 1993, 73rd Leg., R.S., ch. 910, § 6, sec. 4(c), 1993 Tex. Gen. Laws 3834, 3837 (current version at TEX. OCC. CODE § 201.1525).

[28] Act of May 29, 1995, 74th Leg., R.S., ch. 965, § 15, sec. 4(c), 1995 Tex. Gen. Laws 4789, 4802 (current version at TEX. OCC. CODE § 201.1525).

[29] TEX. OCC. CODE § 201.152 (a)–(b).

The board shall adopt rules clarifying what activities are included within the scope of the practice of chiropractic and what activities are outside of that scope. The rules:

    (1)      must clearly specify the procedures that chiropractors may perform;

    (2)      must clearly specify any equipment and the use of that equipment that is prohibited; and

    (3)      may require a license holder to obtain additional training or certification to perform certain procedures or use certain equipment.[30]

Thus, over time the Legislature has chosen to prescribe chiropractic practice in broad terms undefined by statute and to require the Board to clarify by rules what activities are included and excluded. The Board consists of nine members, six chiropractors and three public members, all appointed by the Governor with Senate approval.[31] The chiropractor appointees must be "reputable" and currently "practicing".[32] Eligibility disqualifiers in the Act help protect against conflicts of interest.[33] As a state administrative agency, the Board is required to comply with the notice-and-comment procedures of the Administrative Procedure Act (the APA) when promulgating rules.[34] But the Act also imposes on the Board the additional obligation—"early in the rule development process" and "before [it] complies with the rulemaking requirements of" the APA—to "identify[] [the] persons who will be most affected" by the proposed rules and to solicit their "advice and

---

[30] *Id.* § 201.1525.

[31] *Id.* § 201.051.

[32] *Id.* § 201.051(a)(1).

[33] *See id.* §§ 201.052–201.053.

[34] *Id.* § 201.1526(a); *see also* TEX. GOV'T CODE § 2001.023(a) (requiring an agency to give notice of a proposed rule by publishing it in the Texas Register at least 30 days before its effective date); *id.* § 2001.024 (imposing detailed requirements for the content of the notice); *id.* § 2001.029 (requiring an agency to give "all interested persons a reasonable opportunity" to submit comments and, under certain circumstances, to hold a public hearing before adopting a substantive rule).

opinions".[35] The APA, supplemented by the Act's requirements, assures that the Board's rulemaking process is informed by input from interested parties and the public and provides the protection of judicial review.

## C

In 2006, the Board adopted what is now Rule 78.1, titled "Scope of Practice", defining two critical terms in the Act's definition of chiropractic practice.[36] With respect to the evaluation provision (§ 201.002(b)(1)), Rule 78.1(a)(5) defines *musculoskeletal system* as "[t]he system of muscles and tendons and ligaments and bones and joints and associated tissues and nerves that move the body and maintain its form."[37] With respect to the treatment provision (§ 201.002(b)(2)), Rule 78.1(a)(9) defines *subluxation complex* as

> [a] neuromusculoskeletal condition that involves an aberrant relationship between two adjacent articular structures that may have functional or pathological sequelae, causing an alteration in the biomechanical and/or neuro-physiological reflections of these articular structures, their proximal structures, and/or other body systems that may be directly or indirectly affected by them.[38]

In comments to the Board, TMA opposed the definition of musculoskeletal system as "so broad as to include the nervous system and brain, and requested that the definition be limited to the spine."[39] The Board rejected the request, noting that its definition was based on medical

---

[35] TEX. OCC. CODE § 201.1526(a)–(b).

[36] 31 TEX. REG. 8363–8364 (2006) (codified as an amendment to TEX. ADMIN. CODE § 75.16) (proposed Oct. 6, 2006).

[37] 22 TEX. ADMIN. CODE § 78.1(a)(5).

[38] *Id.* § 78.1(a)(9).

[39] 31 TEX. REG. at 8363.

8

dictionaries and was limited to structures "that move the body and maintain its form."[40] TMA also criticized the definition of subluxation complex as "expansive" and again requested that it be "revised to narrowly focus on the spine."[41] The Board also rejected this request, stating that its definition was consistent with the statute. "[A]s commonly used by health care providers," the Board explained, "and as commonly described in medical dictionaries, the musculoskeletal system includes more than the spine."[42]

The Board also adopted in the 2006 scope-of-practice rule a provision, now in Rule 78.1(d), stating that "[i]n the practice of chiropractic, licensees may render an analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations."[43] At that time, the Act's evaluation provision used only the words "analyze, examine, or evaluate" and did not include the word *diagnose*. Shortly after the rule was adopted, TMA sued for a declaration that diagnosis is the practice of medicine and beyond the Act's authorization of chiropractors to "analyze, examine, or evaluate" certain conditions. The court of appeals rejected TMA's contention, concluding that the diagnosis authorized by the rule was confined to the statutory practice of chiropractic.[44]

While that litigation was pending, the Board in 2010 adopted what is now Rule 78.1(c)(3)(B), authorizing chiropractors who complete specialized training and pass an

---

[40] *Id.*

[41] *Id.* at 8363–8364.

[42] *Id.* at 8364.

[43] 22 TEX. ADMIN. CODE § 78.1(d)(1).

[44] *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 375 S.W.3d 464, 495–496 (Tex. App.—Austin 2012, pet. denied).

examination to perform vestibular-ocular-nystagmus testing, or VONT.[45] VONT is generally an eye-movement test performed with cameras or electrodes to detect nystagmus, a type of involuntary, side-to-side eye movement that may indicate a problem in the brain, inner ears, or eyes. Authorized chiropractors use the test to help diagnose the cause of a patient's balance problem by ruling out a neurological condition that would require referral of the patient to a physician.

A few months later, TMA sued to invalidate the VONT rule as exceeding the scope of chiropractic practice prescribed by the Act. After the court of appeals reversed summary judgment for TMA,[46] TMA amended its pleadings on remand to challenge Rule 78.1(a)'s definitions of the musculoskeletal system and the subluxation complex, asserting that their references to "nerves", "neuromusculoskeletal condition", and "neuro-physiological reflections" exceed the Act's restriction of chiropractic practice to "biomechanical condition[s]".[47] TMA added that the definitions authorized diagnosis, which it continued to insist, as it had in its earlier suit, is solely a medical

---

[45] 35 TEX. REG. 9508, 9508 (2010) (to be codified as an amendment to 22 TEX. ADMIN. CODE § 75.17) (proposed Oct. 22, 2010) (adopting "an amendment to § 75.17 without changes to the proposed text as published" in the *Texas Register* on June 25, 2010). Rule 78.1(c)(3)(B) provides in full that

> Technological Instrumented Vestibular-Ocular-Nystagmus Testing may be performed by a licensee with a diplomate in chiropractic neurology and that has successfully completed 150 hours of clinical and didactic training in the technical and professional components of the procedures as part of coursework in vestibular rehabilitation including the successful completion of a written and performance examination for vestibular specialty or certification. The professional component of these procedures may not be delegated to a technician and must be directly performed by a qualified licensee.

22 TEX. ADMIN. CODE § 781.(c)(3)(B).

[46] *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, No. 03-12-00151-CV, 2012 WL 5974063, at *1 (Tex. App.—Austin Nov. 21, 2012, no pet.) (mem. op.).

[47] *Compare* 22 TEX. ADMIN. CODE § 78.1(a)(5), (a)(9), *with* TEX. OCC. CODE § 201.002(b)(1).

10

practice.[48] After a bench trial, the court issued findings of fact and conclusions of law, holding that the challenged rules are invalid because they exceed the statutory scope of chiropractic practice. It rendered judgment accordingly. The Board appealed, along with the Texas Chiropractic Association (TCA), which had joined the suit.

The court of appeals affirmed in part. Relying on the trial court's findings of fact and the evidence adduced at trial, the court of appeals held that Rule 78.1(a)(5) and (9), defining musculoskeletal system and subluxation complex as involving the nervous system, exceed the scope of practice prescribed by § 201.002(b)(1)–(2) of the Act. The court concluded:

> Although consideration of other bodily systems may be necessary to evaluate the biomechanical condition of the spine and the musculoskeletal system, that does not mean that the definition of "musculoskeletal system" should be expanded to include associated nerves or that "subluxation complex" should be defined as a condition extending beyond the musculoskeletal system. Based on our review of the evidence put forth before the trial court, we hold that sufficient evidence supports the court's findings related to the Rule's reference to nerves and the "neuromusculoskeletal system" in its definition of "musculoskeletal system" or "subluxation complex."

The court reached the same conclusion regarding Rule 78.1(c)(3)(B), allowing certain chiropractors to use VONT testing:

> Although [the Board] produced evidence indicating that VONT may be a useful tool to chiropractors, the evidence establishes that VONT helps in the diagnosis of vestibular issues. The evidence further establishes that, although vestibular diseases might have an impact on the musculoskeletal system, disorders falling within the ambit of chiropractic do not cause vestibular pathologies. Simply because the test might under some circumstances be useful does not require that chiropractors be able to perform the test—the fact remains that the scope of chiropractic practice is limited under Texas law. On this record, we cannot conclude that the trial court erred in its findings of fact or in concluding that the Rule's provision related to VONT exceeded the scope of chiropractic.[49]

---

[48] On interlocutory appeal, the court of appeals rejected the Board's argument that TMA's *diagnosis* complaint was a collateral attack on the final judgment in the prior case. *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, No. 03-14-00396-CV, 2014 WL 7014530, at *1 (Tex. App.—Austin Dec. 8, 2014, pet. denied) (mem. op.).

[49] 566 S.W.3d 776, 785–787 (Tex. App.—Austin 2018) (citation omitted).

11

While the appeal was pending, the Legislature amended the evaluation provision of the Act to add the word *diagnose*, so that the Act now authorizes chiropractors to "diagnose, analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system".[50] The court of appeals reversed the trial court's judgment invalidating the rules as authorizing diagnosis outside the statutory scope of chiropractic practice.[51]

We granted the Board's and TCA's petitions for review. As their positions are aligned, we refer to their arguments simply as the Board's.

## II

As a threshold matter, the Board argues that the APA affords TMA no basis for challenging Rule 78.1. Section 2001.038(a) allows a challenge to an administrative rule "if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff."[52] The Board argues that TMA's assertions do not meet this standard because there is no evidence that chiropractors are practicing medical neurology or failing to refer patients with medical problems to physicians. TMA, the Board contends, has done no more than assert policy differences with the Legislature over the scope of chiropractic practice. TMA responds that it has alleged that Rule 78.1 diminishes the privilege of practicing medicine and the value of physicians' medical licenses by authorizing the unlicensed practice of medicine.

---

[50] Act of May 22, 2017, 85th Leg., R.S., ch. 294, § 1, 2017 Tex. Gen. Laws 545, 545 (codified at TEX. OCC. CODE § 201.002(b)(1)).

[51] 566 S.W.3d at 787–788; *see Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 41 (Tex. 2017) (rejecting TMA's challenge to an agency rule permitting therapists to provide diagnostic assessments as invading the practice of medicine).

[52] TEX. GOV'T CODE § 2001.038(a).

12

We agree with TMA that its allegation satisfies § 2001.038(a). The MPA recognizes that "the practice of medicine is a privilege" reserved to physicians subject to "licensing, regulating, and disciplining" under that statute.[53] Obtaining and maintaining the privilege of practicing medicine imposes economic costs on physicians, and allowing nonphysicians to practice medicine outside the MPA's control would impair—or at least threaten to impair—that privilege.

The Board characterizes § 2001.038(a) as a "statutory standing" provision. Constitutional standing is a prerequisite for subject matter jurisdiction.[54] In *Finance Commission of Texas v. Norwood*, we treated § 2001.038(a) "as but another expression of the general[,] [constitutional] doctrine of standing."[55] But last Term in *Pike v. EMC Management, LLC*, we discouraged the use of the term *standing* to describe extra-constitutional restrictions on the right of a particular plaintiff to bring a particular lawsuit.[56] "[T]he question whether a plaintiff has . . . satisfied the requisites of a particular statute", we said, "pertains in reality to the right of the plaintiff to relief rather than to the subject-matter jurisdiction of the court to afford it."[57]

Although the Board does not argue that TMA lacks constitutional standing, "we have an obligation to examine our jurisdiction any time it is in doubt".[58] Constitutional standing requires a

---

[53] TEX. OCC. CODE § 151.003.

[54] *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 150 (Tex. 2012); *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–305 (Tex. 2008). In Texas, the constitutional prerequisite of standing is grounded in the Open Courts and Separation of Powers provisions of the Texas Constitution. *See* TEX. CONST. art. I, § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."); *id.* art. II, § 1 ("The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy . . . and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others . . . .").

[55] 418 S.W.3d 566, 582 n.83 (Tex. 2013).

[56] 610 S.W.3d 763, 774 (Tex. 2020).

[57] *Id.* (citing *Dubai Petrol. Co. v. Kazi*, 12 S.W.3d 71, 76–77 (Tex. 2000) (cleaned up)).

[58] *Pike*, 610 S.W.3d at 774.

13

concrete injury that is both traceable to the defendant's conduct and redressable by court order.[59] When constitutional standing is raised for the first time on appeal, the test must be lenient because "there is no opportunity [for the plaintiff] to cure [a pleading] defect."[60] Construing the record "liberally . . . as [we] must" at this stage[61] and "resolving any doubt in [TMA's] favor",[62] we conclude that TMA has constitutional standing to bring this lawsuit. Keeping in mind that no party contests TMA's constitutional standing, we conclude that TMA's assertion that some physicians will suffer economic harm due to increased competition from chiropractors sufficiently alleges the concrete injury required for standing.[63] That alleged injury is directly traceable to the Board's rule-making and would be redressed here by judicial invalidation of the challenged rules. Likewise, no party contests TMA's associational standing to file suit on behalf of its members, and we conclude that TMA's unchallenged allegations satisfy the requirements under our caselaw for associational standing.[64]

---

[59] *See Heckman v. Williamson Cty.*, 369 S.W.3d 137, 154–155 (Tex. 2012) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992)). Texas has adopted the constitutional standing test employed by the federal courts.

[60] *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

[61] *Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 555, 582 (Tex. 2013).

[62] *Tex. Ass'n of Bus.*, 852 S.W.2d at 447.

[63] *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970) (holding that organizations could demonstrate constitutional standing to challenge government action based on "alleg[ations] that [increased] competition" resulting from such official action "might entail some future loss of profits" for the firms represented by the plaintiff organization).

[64] In *Texas Association of Business v. Texas Air Control Board*, we adopted the three-part test for associational standing articulated by the Supreme Court of the United States: "(a) [the association's] members would otherwise have standing to sue in their own right; (b) the interests [the association] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit." 852 S.W.2d at 447 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Having concluded that TMA is entitled to bring this action, we will now consider the merits of its claims.

**III**

The issue before us is whether Rules 78.1(a)(5) and (9), which define *musculoskeletal system* and *subluxation complex*, and Rule 78.1(c)(3)(B), which allows certain chiropractors to perform VONT, exceed the scope of practice prescribed by § 201.002(b)(1)–(2) of the Act. We first set out our standard of review, then consider its application to Board rulemaking, and finally determine the validity of the challenged rules.

**A**

Our standard of review in this case is well settled. The parties agree, as they must, that interpreting the Act and the rules involves only questions of law, which we determine de novo.[65] Although the court of appeals never expressly agreed or disagreed with this standard, it repeatedly stated that its holdings were based on the evidence and the trial court's findings. While it was not improper for the trial court to allow evidence to be offered as background describing medical and chiropractic practice and placing the case in context, the question whether the Board exceeded its authority by adopting rules that conflict with the Act is a legal one.

The parties also agree, again as they must, that agency rules are presumed valid and that the challenger has the burden of showing that a "rule's provisions are not 'in harmony with the general objectives of the act involved.'"[66] The court of appeals acknowledged this principle in

---

[65] *See Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 33 (Tex. 2017).

[66] *Id.* at 33 (quoting *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 750 (Tex. 1995)).

15

setting out the standard of review[67] but never in its analysis, which gave no deference to the Board's expertise regarding chiropractic practice.

When statutes use terms they do not define, as the Act does, "we must apply their common, ordinary meaning unless a contrary meaning is apparent from the statute's language."[68] Of course, the Act's terms must be understood in the context of healthcare in general and chiropractic practice in particular, which are the subject of the Act.[69] The issue is whether the definitions that the Board adopted in the rules are consistent with the meaning of the terms in the Act.

We recently applied these principles in another case involving a challenge by TMA to the validity of an administrative rule. In *Texas State Board of Examiners of Marriage and Family Therapists v. Texas Medical Association*, TMA objected to an agency rule authorizing marriage and family therapists to provide diagnostic assessments using the Diagnostic and Statistical Manual of Mental Disorders, commonly referred to as the DSM.[70] TMA argued there, as it also has in this case, that diagnosis is the practice of medicine and that the rule violated both the Licensed Marriage and Family Therapists Act and the MPA by empowering therapists to diagnose any mental disease or disorder. The Therapists Board countered that the rule only authorized therapists to diagnose disorders within their sphere of expertise and training.

We treated the question of the rule's validity as a purely legal one and explained that we were obliged to decide it "based on the relevant Texas statutes" and "not on whether [therapists]

---

[67] *See* 566 S.W.3d 776, 781 (Tex. App.—Austin 2018).

[68] *Marriage & Family Therapists*, 511 S.W.3d at 34.

[69] *Cf. Murphy Expl. & Prod. Co.-USA v. Adams*, 560 S.W.3d 105, 109 (Tex. 2018) (explaining that when interpreting an oil-and-gas lease, "we may consider 'objectively determinable facts and circumstances that contextualize the parties' transaction' and 'inform' the meaning of the language used" (quoting *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 758 (Tex. 2018))).

[70] 511 S.W.3d at 30.

are qualified to make DSM diagnoses or whether other states' laws allow them to."[71] We began our analysis with the general principle that state administrative agencies like the Therapists Board have "only those powers that the Texas Legislature has expressly conferred upon [them] and those implied powers that are reasonably necessary to carry out [their] statutory duties."[72] Agency rules must therefore be "authorized by and consistent with [their] statutory authority."[73] "Courts generally presume", we said, "that agency rules are valid, so parties who challenge a rule have the burden of proving its invalidity."[74] The challenger's ultimate burden is to demonstrate "that the rule's provisions are not 'in harmony with the general objectives of the act involved'", which we discern from the statute's plain text.[75] The challenger can meet his burden by showing that the challenged rule: "(1) contravenes specific statutory language; (2) runs counter to the general objectives of the statute; or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions."[76] Where the plaintiff argues that an agency rule is too permissive, only the first two showings are relevant.

In *Marriage and Family Therapists*, we explained that when the governing statute does "not define . . . key terms, we . . . apply their common, ordinary meaning unless a contrary meaning is apparent from the statute's language."[77] We cited for this proposition *University of Texas at*

---

[71] *Id.* at 33.

[72] *Id.*

[73] *Id.* (quoting *R.R. Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 685 (Tex. 1992)).

[74] *Id.*

[75] *Id.* (quoting *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 750 (Tex. 1995)).

[76] *Id.*

[77] *Id.* at 34.

17

*Arlington v. Williams*, where we had reiterated that "context is fundamental to understanding the use of language" and cautioned against drawing "meaning . . . from isolated words or phrases".[78] If a definition that is "different, more limited, or [more] precise" than the dictionary definition "is apparent from the term's use in the context of the statute, [then] we apply that meaning."[79]

The starting point of our analysis in *Marriage and Family Therapists* was the language of the Licensed Marriage and Family Therapists Act authorizing therapists to engage in "the evaluation and remediation of cognitive, affective, behavioral, or relational dysfunction in the context of marriage or family systems."[80] Against that standard we compared the Therapists Board rule authorizing therapists to provide a diagnostic assessment using the DSM "as part of their therapeutic role to help individuals identify their emotional, mental, and behavioral problems when necessary."[81] TMA conceded that the statutory authorization of evaluations included authorization for assessments, but it argued that the inclusion in the rule of the adjective *diagnostic* was a bridge too far. After looking to both traditional and medical dictionary definitions of the relevant terms to discern their "common, ordinary meanings . . . within their statutory context",[82] we concluded that TMA was "mak[ing] too much of the rule's use of the word 'diagnostic.'"[83]

---

[78] 459 S.W.3d 48, 52 (Tex. 2015) (citing *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning.")).

[79] *In re Hall*, 286 S.W.3d 925, 929 (Tex. 2009) (orig. proceeding) (citing *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002)).

[80] 511 S.W.3d at 34 (quoting TEX. OCC. CODE § 502.002(6)).

[81] *Id.* (quoting 22 TEX. ADMIN. CODE § 801.42(13)).

[82] *Id.* at 38.

[83] *Id.* at 37.

Critically, we looked to other Therapists Board rules to provide context for the rule that TMA was challenging. Our conclusion that TMA had not met its burden of demonstrating that the rule authorizing diagnostic assessments exceeded the statutory scope of practice was based in part on other rules limiting therapists to providing "services within [their] professional competency" and requiring referral of a client to another care provider when appropriate.[84]

An undercurrent of TMA's argument in *Marriage and Family Therapists* was that any act within the statutory scope of medical practice must necessarily be excluded from the statutory scope of other healthcare professions. We rejected that line of thinking, explaining that "every act that a physician may do is not automatically the unlawful practice of medicine when done by a non-physician, and terminology in one field may overlap with that of another."[85] This principle is clear from the text of the MPA, which defines medical practice in the broadest terms possible— "the diagnosis[] [or] treatment" of any "mental or physical disease or disorder", "physical deformity", "or injury"[86]—and then exempts from the prohibition against unlawfully practicing medicine certain nonphysician healthcare providers "engaged strictly in the practice of" their professions as they are "defined by law".[87] Thus, the question in a § 2001.038(a) suit for judicial review of an agency rule regulating nonphysician healthcare providers is not whether any part of the rule authorizes a provider to engage in an activity that also constitutes the practice of medicine. Rather, the question is whether the plaintiff has overcome the presumption that the rule is valid by showing

---

[84] *Id.* at 39 (quoting 22 TEX. ADMIN. CODE § 801.44(r)).

[85] *Id.* at 41.

[86] TEX. OCC. CODE § 151.002(13).

[87] *Id.* § 151.052.

that any part of the rule either "contravenes specific . . . language" of the regulated profession's enabling statute or "runs counter to the general objectives of" that statute.[88]

## B

The lower courts failed to apply this analysis, even though the court of appeals had the benefit of our decision in *Marriage and Family Therapists* and even though the legal principles we applied there broke no new ground. The trial court weighed evidence—specifically, witness testimony presenting each side's view of the appropriate line between chiropractic and medical neurology—as if it were doing the Board's work anew. The court's findings of fact and conclusions of law make it clear that it failed to afford Rule 78.1 a presumption of validity. For example, the court found that "[t]here is no commonly accepted definition of musculoskeletal system that includes nerves"—implicitly crediting TMA's evidence over the Board's. TMA witnesses testified that strict anatomical lines delineate one system of the human body from another.[89] Board witnesses testified that chiropractic takes a functional view of the body that does not permit the biomechanical condition of the muscles and bones that comprise the musculoskeletal system to be evaluated apart from the nerves that animate them. The court of appeals gave a nod to our analysis in *Marriage and Family Therapists* but then held that in light of the witness testimony presented by TMA, "sufficient evidence" supported the trial court's judgment that Rule 78.1 exceeds the

---

[88] *Marriage & Family Therapists*, 511 S.W.3d at 33. The third prong of the test—whether the challenged rule "imposes additional burdens, conditions, or restrictions in excess of or inconsistent with" the Act, *id.*—does not apply here because TMA argues that Rule 78.1 is too broad, not too narrow.

[89] The trial court's findings of fact adopt the view of TMA's witnesses that the distinct systems of the human body are skeletal, muscular, nervous, cardiovascular, digestive, reproductive, urinary, endocrine, and integumentary (skin).

20

statutory scope of chiropractic.[90] In so doing, the court applied an incorrect standard of review. The proper question for the court was whether, despite Rule 78.1's presumption of validity, the rule contravenes the Act's specific text or runs counter to its purpose as a matter of law.

With the Board, the Legislature has delegated to a regulated group of practitioners and public members the responsibility of "clarifying what activities are included within the scope of the practice of chiropractic and what activities are outside of that scope",[91] and it has required the Board in doing so to take measures beyond what is required by the APA to "seek input early in the rule development process" from the "persons who will be most affected" by it.[92] Judges are experts in statutory analysis, not in healthcare. To prevent expensive and time-consuming usurpations of administrative agencies' policymaking work, the court's inquiry in a § 2001.038(a) suit challenging the validity of an agency rule must be limited. The textual analysis we set out in *Marriage and Family Therapists* ensures that courts will stay in their lane. To that analysis we now turn.

## C

TMA contends that Rule 78.1(a)'s references to nerves exceed the Act's scope of chiropractic practice. Specifically, the rule's definition of the statutory phrase *musculoskeletal system* includes not only bones, joints, muscles, tendons, and ligaments but also the "associated . . . nerves that move the body and maintain its form."[93] And the rule defines the statutory phrase *subluxation complex* as a "neuromusculoskeletal condition" that can alter certain "neuro-physiological

---

[90] 566 S.W.3d 776, 781 (Tex. App.—Austin 2018) (restating the legal analysis set forth in *Marriage & Family Therapists*); *id.* at 785–786 (reviewing the testimony and concluding that "sufficient evidence supports the [trial] court's findings related to the [Scope of Practice] Rule's reference to nerves . . . in its definition of 'musculoskeletal system' [and] 'subluxation complex'"); *id.* at 787 (affirming the trial court's judgment that the VONT rule is invalid).

[91] TEX. OCC. CODE § 201.1525.

[92] *Id.* § 201.1526(b).

[93] 22 TEX. ADMIN. CODE § 78.1(a)(5).

reflections".[94] TMA argues that these references to nerves authorize chiropractors to diagnose any neurological condition, which is the practice of medicine.

TMA's argument echoes its position in *Marriage and Family Therapists* that a rule permitting therapists to make diagnostic assessments allows them to diagnose any mental disorder. But here, as was the case there, the rule's words cannot be read beyond their context. Nothing in Rule 78.1 suggests that chiropractic practice extends beyond the evaluation and treatment of the musculoskeletal system. The rule merely acknowledges the reality that chiropractors cannot ignore the presence and effect of associated nerves that help shape the musculoskeletal system and allow it to move. The Board's definition of musculoskeletal system only includes those nerves "associated" with the muscles, tendons, ligaments, bones, joints, and tissues "that move the body and maintain its form." For Rule 78.1 to exceed its proper scope, the rule must contravene the Act's specific words or purpose. It does neither. Nothing in the text of either definition gives chiropractors carte blanche to practice medical neurology, and the Board has rejected the notion that chiropractic is so broad.

Though the Act contains some specific exclusions from chiropractic—"incisive or surgical procedures", prescribing drugs, and using x-rays or other therapies that expose the body to radiation[95]—it certainly cannot be read to include all healthcare that it does not specifically exclude, and the Board makes no argument to the contrary. Because chiropractic is carved out of the comprehensive regulation of the practice of medicine under the MPA, its scope under the Act must be limited. Rule 78.1 acknowledges and respects the Act's boundaries.

---

[94] *Id.* § 78.1(a)(9).

[95] TEX. OCC. CODE § 201.002(c).

The limited nature of Rule 78.1(a)'s definitions is clear when they are considered alongside other Board rules. Directly below the definitions of musculoskeletal system and subluxation complex, another section of Rule 78.1 defines chiropractic practice exactly as the Act does, word for word.[96] The Rule also explains that Board licensees are expected to "provide necessary examination and evaluation services" to "[d]ifferentiate a patient or condition for which chiropractic treatment is appropriate from a patient or condition that is in need of care from a medical or other class of provider."[97] Rule 79, governing "Unprofessional Conduct", states that "[a] licensee shall . . . timely refer a patient to another appropriate health care provider for a condition outside the scope of practice"[98] and that "[a] licensee *may not* . . . perform or attempt to perform procedures for which the licensee is untrained".[99] Licensees who engage in unprofessional conduct are "subject to disciplinary action."[100] Far from authorizing chiropractors to stray beyond the Act's boundaries, the Board's rules, taken together, seek to ensure that chiropractors remain inside them.

TMA argues that no commonly accepted definition of the musculoskeletal system includes nerves. But TMA over reads Rule 78.1. The rule merely recognizes the reality that musculoskeletal dysfunctions cannot be diagnosed or treated without considering associated nerves. Medical neurology is a far broader field. The Board argues that chiropractors must consider the nerves involved in a musculoskeletal system in order to determine whether referral to a neurologist is required. TMA characterizes this view as functional and argues that it ignores the fact that body systems are

---

[96] 22 TEX. ADMIN. CODE § 78.1(b)(1).

[97] *Id.* § 78.1(c)(1).

[98] *Id.* § 79.2(a) (emphasis added).

[99] *Id.* § 79.2(b) (emphasis added).

[100] *Id.* § 79.2(c).

separate. But it is not for the judiciary to decide between these competing views. That decision was the Board's, and it could reasonably consider neural involvement in the musculoskeletal system in defining the scope of chiropractic. TMA argues that the danger is that a chiropractor will not make a referral to a neurologist when one is required. But the answer to TMA's concern is in Rule 79, which provides for professional discipline if that were to occur.

For all of these reasons, we conclude that TMA "makes too much" of the references to nerves in the Board's definitions of musculoskeletal system and subluxation complex.[101] TMA has not overcome the definitions' presumption of validity by demonstrating that they contravene specific language in the Act or run counter to the Act's objectives.[102]

## D

TMA also challenges Rule 78.1(c)(3)(B)'s authorization for chiropractors who have completed specialized training to perform VONT. The technical language of the rule does not aid our statutory analysis. The parties describe VONT as a test that measures a patient's eye movements with a camera or through electrodes, and they agree that it does not fall within any category of procedure that the Legislature has expressly excluded from the scope of chiropractic—VONT is not "incisive or surgical"; it does not require "the prescription of controlled substances"; and it does not "use . . . x-ray therapy" or otherwise "expose[] the body to radioactive materials."[103] TMA presented evidence in the trial court that VONT is a neurological test that a medical doctor may use to diagnose a problem of the brain, inner ear, or eyes, none of which is a part of the spine or

---

[101] *Marriage & Family Therapists*, 511 S.W.3d at 37.

[102] *See id.* at 34.

[103] TEX. OCC. CODE § 201.002(c).

musculoskeletal system. Therefore, TMA argues, it exceeds the statutory scope of chiropractic for a chiropractor to perform VONT.

But the Board also presented evidence that VONT can be used to facilitate chiropractic treatment. One chiropractor witness, Frederick Carrick, D.O., testified by deposition that because spinal joints move reflexively opposite the direction of eye movements, VONT can "tell[] you the integrity of spinal musculature in reaction reflexogenically to an environmental perturbation" and "can be indispensable in [demonstrating] what side of the spine to treat".[104] The Board explains that a chiropractor can also use VONT to rule out nonchiropractic causes of certain disorders, which can help the chiropractor to determine whether chiropractic treatment is appropriate or whether the patient should be referred to another healthcare provider. The Board gives the example of a patient who comes to a chiropractor with dizziness, a common occurrence. Dizziness has numerous possible causes, many of which are outside the scope of chiropractic. But one possible cause is cervical vertigo—dizziness arising from head-and-neck misalignment, often the result of a sports injury or car accident—which can be treated with manual manipulation. The Board presented evidence that a negative VONT test can help to confirm a diagnosis of cervical vertigo by ruling out a problem in the brain, inner ear, or eyes, a process known as making a differential diagnosis.

Though the dissent agrees that Rule 78.1's references to nerves in defining the musculoskeletal system and the subluxation complex properly "clarify the Legislature's scope-of-practice

---

[104] Dr. Carrick is licensed in New Hampshire and has never practiced in Texas. In fact, it appears that VONT is not widely used by Texas chiropractors. TCA maintains that since the Board's adoption in 2010 of the rule approving VONT's use, only two chiropractors in Texas have jumped through the regulatory hoops to receive Board authorization to use it.

limitations",[105] it argues that the rule's authorization of specially trained chiropractors to perform VONT exceeds these limitations. However, a reading of all the Board's rules together makes it clear that a chiropractor's proper use of VONT is not for treating a neurological condition, which is certainly outside the scope of chiropractic, but rather for the limited purpose of determining whether and how to treat a patient's musculoskeletal system. The Legislature has authorized chiropractors "to diagnose . . . the biomechanical condition of the spine and musculoskeletal system".[106] In Rule 78.1, which is presumptively valid, the Board has set out how a VONT test can be used to perform that diagnosis without exceeding the statutory scope of chiropractic. The dissent dramatically concludes that with the Rule's limited authorization of VONT, "limitations on chiropractic practice lose all meaning" and "[a] chiropractor's practice becomes coextensive with a medical doctor's practice".[107] But far from equating chiropractors and physicians, the Board's rules in fact carefully observe the statutory boundary between the two professions.

The dissent also echoes TMA's argument that the Act does not permit chiropractors to make differential diagnoses by ruling out possible neurological causes of a patient's dysfunction. The dissent says that "[t]o 'rule out' a neurological condition based on a neurological examination is to say, affirmatively, that it is not a cause of the patient's symptoms."[108] The accuracy of this characterization is questionable. A more realistic explanation of differential diagnosis is that it is the process every healthcare provider goes through when assessing a patient's symptoms to determine whether it is appropriate to treat the patient or refer the patient elsewhere. An unchallenged

---

[105] *Post* at 6.

[106] TEX. OCC. CODE § 201.002(b)(1).

[107] *Post* at 8.

[108] *Id.* at 9.

26

Board rule expressly addresses this process by requiring chiropractors to refer patients to other healthcare providers when appropriate.[109] Yet the dissent would not allow this routine process to ever take place. The way the dissent sees it, any time a patient goes to a chiropractor with a generalized problem like dizziness that could potentially have a cause outside the scope of chiropractic, the chiropractor must immediately stop treatment and refer the patient to a medical doctor. There is no textual support for this argument in the Act.

Simply put, a healthcare provider cannot diagnose a problem without ruling out other potential causes of the problem. In other words, making a differential diagnosis is an unavoidable part of making a diagnosis. Virtually any problem that a chiropractor treats could potentially have a nonchiropractic source. Accepting the dissent's position would effectively read into the Act a requirement that patients obtain a referral for chiropractic treatment when the Legislature has not imposed one.

In sum, the VONT-authorization rule is presumptively valid,[110] no specific language in the Act forbids chiropractors from performing VONT, and the Board has articulated how a chiropractor might use the test "to diagnose, analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system".[111] Because a § 2001.038(a) suit challenges the facial validity of an agency rule, that must be the end of the inquiry. The court of appeals reasoned that "[s]imply because [VONT] might under some circumstances be useful does not require that chiropractors be able to perform the test".[112] Whether VONT *should* be used by chiropractors is a

---

[109] 22 TEX. ADMIN. CODE § 79.2(a)(5).

[110] *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 33 (Tex. 2017).

[111] TEX. OCC. CODE § 201.002(b)(1).

[112] 566 S.W.3d 776, 787 (Tex. App.—Austin 2018).

policy judgment for the Legislature and the Board, not for the courts.[113] The sole question for courts is whether the text or objectives of the Act forbid chiropractors from using VONT.[114] We hold that they do not.

*　　*　　*　　*　　*

Applying the proper standard of review, we conclude that TMA has not carried its burden of demonstrating that the challenged provisions of Rule 78.1 contravene the specific text or the objectives of the Act. Accordingly, we reverse the judgment of the court of appeals in part and render judgment declaring that the challenged provisions are valid.

 

 

_____

Nathan L. Hecht
Chief Justice

Opinion delivered: January 29, 2021

---

[113] *Marriage & Family Therapists*, 511 S.W.3d at 33 ("[W]e must decide this case based on the relevant Texas statutes, not on whether MFTs are qualified to make DSM diagnoses or whether the DSM or other states' laws allow them to.").

[114] *See id.*